**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CLAUDIA WHITTAKER,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **HARTFORD LIFE INSURANCE** | : | |
| **COMPANY,** | : | **No. 11-6465** |
| Defendant. | : | |

## <u>MEMORANDUM</u>

**Schiller, J.**                                                         **November 25, 2012**

Claudia Whittaker sued Hartford Life Insurance Company ("Hartford") under the Employee Retirement Income Security Act of 1974 ("ERISA"). She alleges that Hartford wrongfully terminated the long term disability ("LTD") benefits that she had been receiving under a group benefit plan ("Plan") administered by Hartford. Whittaker seeks a declaration that she was disabled within the meaning of the Plan at the time Hartford terminated her benefits and an award of the benefits she alleges she is owed under the Plan. Presently before the Court are Hartford's and Whittaker's cross-motions for summary judgment. For the reasons that follow, the Court grants Hartford's motion for summary judgment and denies Whittaker's.

## I.       BACKGROUND

### A.       LTD Benefits Policy

Whittaker was employed as an Associate Director of Case Management at Lenape Valley Foundation ("Lenape"). (Pl.'s Statement of Undisputed Facts and Mem. of Law in Supp. of Mot. for Summ. J. [Whittaker SOF] ¶ 1.) Hartford provided LTD coverage for Lenape employees, and Whittaker was a participant in the Plan. (*Id.* ¶ 2.) The policy states:

**Disability or Disabled** means:
1. during the Elimination Period, you are prevented from performing one or more of the Essential Duties of your Occupation;
2. for the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly earnings are less than 80% of your Indexed Pre-disability Earnings;
3. after that, you are prevented from performing one or more of the Essential Duties of Any Occupation.

(J.A. at LTD HLI 192.) The policy then defines "Elimination Period" as "the period of time you must be Disabled before benefits become payable." (*Id.* at LTD HLI 133, 518.) "Your Occupation" is defined as "your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location." (*Id.* at LTD HLI 195.) "Essential Duty" under the policy means one that "1. is substantial, not incidental; 2. is fundamental or inherent to the occupation; and 3. can not be reasonably omitted or changed." (*Id.* at LTD HLI 192.)

Whittaker's elimination period was ninety days, beginning from the date of her disability; her elimination period thus ended on August 23, 2006. (*Id.* at LTD HLI 518.) Whittaker's benefits were terminated on August 7, 2008, during the twenty-four months following the elimination period. Therefore, Whittaker was considered disabled under the Plan at that time if she was unable to perform an essential duty of her occupation and experienced a resultant drop in income of at least twenty percent. (*See id.* at LTD HLI 192.) The parties do not dispute that this is the provision of the Hartford policy relevant to Whittaker's case, and Hartford does not challenge Whittaker's fulfillment of the decreased-income component of the Plan's disability definition.

The Plan gives Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (*Id.* at LTD HLI 212.)

**B.**     **Whittaker's Medical History and Application for LTD Benefits**

On February 1, 2006, Whittaker saw Dr. Charles B. Burrows, an orthopaedist, for right shoulder and low-back pain. An MRI of Whittaker's right shoulder revealed "moderate degenerative changes of the acromioclavicular joint with impingement of the subacromial space and tendinosis of the supraspinatus tendon with a partial-thickness tear." (*Id.* at LTD HLI 498.) The MRI also indicated "multilevel degenerative changes" and "moderate to severe central canal narrowing" in the lumbosacral spine. (*Id.*) Dr. Burrows gave Whittaker Kenalog and lidocaine injections and suggested she visit a spine specialist. (*Id.*) Whittaker was uncertain about visiting the specialist, so Dr. Burrows also recommended epidural steroid injections. (*Id.*) Whittaker returned to Dr. Burrows on April 7, 2006 and reported "significant relief" from the epidural steroid injections. (*Id.* at LTD HLI 500.)

On April 14, 2006, Dr. Burrows's physician's assistant examined Whittaker for left degenerative Achilles tendonitis. (*Id.* at LTD HLI 501.) On May 24, 2006, Whittaker stopped work due to the pain in her left ankle and in preparation for upcoming surgery to repair her Achilles tendon on June 6, 2006. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶¶ 8-9.)

In August 2006, Whittaker visited Dr. Burrows and told him that her low-back pain had increased and that the epidural injections were no longer providing relief. (Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J. [Hartford SOF] ¶ 10.) An MRI showed no "significant changes" from the prior exam, except for a compression fracture in the spine. (J.A. at LTD HLI 497.)

On September 7, 2006, Whittaker applied for LTD benefits from Hartford due to her Achilles tendonitis, which caused "tingling in her left foot" and "pain in her left leg," making it difficult for her to walk to meetings, drive, and concentrate. (*Id.* at LTD HLI 529-37.) Whittaker also submitted

an Attending Physician's Statement of Disability signed by Dr. Burrows, which stated that Whittaker's primary diagnosis was osteoarthritis in her knees, with secondary diagnoses of a rotator cuff tear, spinal stenosis, and lumbar radiculitis. (*Id.* at LTD HLI 540.) As a result, Dr. Burrows wrote, Whittaker would be unable to stand, walk, sit, lift, carry, push, pull, or drive "on a long-term basis." (*Id.* at LTD HLI 541.)

In a letter dated October 30, 2006, Hartford approved Whittaker's claim for LTD benefits, effective August 23, 2006. (*Id.* at LTD HLI 515-18.) Hartford's letter additionally informed Whittaker that benefit payments would continue "while you meet the policy definition of Disability." (*Id.* at LTD HLI 515.) Whittaker was notified by a letter dated December 10, 2006 that she had also been awarded Social Security disability benefits, effective November 2006. (*Id.* at LTD HLI 509.)

### C.      Changes in Whittaker's Condition

Whittaker was treated by several doctors in 2007 and early 2008. (Hartford SOF ¶¶ 17, 19-21, 24-25.) During this period, Whittaker submitted two Claimant Questionnaires. On the first, dated March 4, 2007, Whittaker listed her medical conditions as arthritis in her knees, back, and shoulder, spinal stenosis, asthma, depression, and a tear in her right upper arm. (J.A. at LTD HLI 485.) She reported a change in her condition, citing increased pain and decreased ability to walk. She was, however, able to perform all daily activities without assistance, except that she used equipment to help her bathe. (*Id.*) Dr. Burrows additionally submitted an Attending Physician Statement dated September 14, 2007, in which he reported that Whittaker would be unable to lift, carry, bend, kneel, drive, or reach for things for the rest of her life. (*Id.* at LTD HLI 478.)

In the second Claimant Questionnaire, dated March 10, 2008, Whittaker indicated that she

experienced "pain most of the time in spite of pain medication," spasms down both legs while sitting or walking, and numb feet when she walked distances, which caused difficulty balancing. (*Id.* at LTD HLI 468.) She reported an additional diagnosis of psoriatic arthritis and worsening of her spinal stenosis. Whittaker's daily routine involved reading and watching television in bed until noon. She then ate lunch and could do one activity per day, such as "attempt[ing] to do housework or shop for groceries." (*Id.*) However, she now reported that she could perform her daily activities independently—including bathing. (*Id.*)

### D. Hartford's Investigation of Whittaker's Condition and Termination of Benefits

On April 3, 2008, Hartford sent letters to Whittaker's doctors asking them to fill out Physical Capacities Evaluation ("PCE") forms so that Hartford could evaluate Whittaker's LTD claim. (*Id.* at LTD HLI 32-37.) In response to Hartford's request, Dr. Gene Shaffer, an orthopaedist who had treated Whittaker's Achilles tendon, wrote on April 11, 2008 that Whittaker had "no limitations." (*Id.* at LTD HLI 443-44.) Dr. Robert A. Kimelheim, Whittaker's rheumatologist, wrote on April 14, 2008 that, though Whittaker had pain in her legs from her spinal stenosis that made standing, walking, and balancing difficult, she could sit in a "general workplace environment" for an hour at a time for a total of four hours a day, as well as stand and walk, each for two hours per day, up to fifteen minutes at a time. (*Id.* at LTD HLI 392.) He further reported that she could drive, handle, finger, and feel "constantly," climb, balance, or stoop "frequently," and do some lifting and reaching. (*Id.* at LTD HLI 392-93.) In a July 23, 2008 response to a letter from a vocational case manager employed by Hartford, Dr. Kimelheim specifically indicated that Whittaker could reach waist level to use a keyboard. (*Id.* at LTD HLI 376-77.)

5

However, Dr. Burrows responded with a PCE on April 24, 2008, in which he called Whittaker "disabled" and wrote that she could not sit, stand, or walk in a workplace environment, nor do any lifting, climbing, balancing, stooping, reaching, handling, fingering, or feeling. He acknowledged only that she could drive occasionally. (*Id.* at 424-25.)

Hartford also faxed letters to Dr. Susan M. Purcell, Whittaker's internal medicine physician, and Dr. Burrows on June 16, 2008, asking whether each doctor agreed with the aforementioned restrictions and limitations set forth by Dr. Kimelheim. (*Id.* at LTD HLI 379-80.) Dr. Purcell responded that she agreed with Dr. Kimelheim's assessment and deferred future restrictions and limitations to him. (*Id.* at LTD HLI 380.) Hartford also received a response from Dr. Burrows's physician's assistant, Jeffrey Kummery, stating that he agreed with the restrictions and limitations outlined by Dr. Kimelheim. (*Id.* at LTD HLI 379.)

Hartford undertook an occupational analysis of Whittaker's case on July 24, 2008. The analysis determined that the essential duties of Whittaker's occupation included "working with [the] board of directors to establish policies and programs, assum[ing] responsibility for development and administration standards, prepar[ing] and distribut[ing] reports, and inspect[ing] agency operations." (*Id.* at LTD HLI 357-58.) It further found that these duties required "Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally[, m]ostly sitting, may involve standing or walking for brief periods of time," and that Whittaker's was a sedentary occupation. (*Id.* at LTD HLI 370.)

On August 7, 2008, Hartford determined that, as of July 28, 2008, Whittaker had been able to perform the essential duties of her occupation and thus no longer qualified as disabled under the policy. Hartford accordingly stopped paying Whittaker LTD benefits as of August 6, 2008. (*Id.* at

LTD HLI 355.)

On August 28, 2008, after he had learned of the termination of Whittaker's benefits, Dr. Burrows wrote to Hartford to express his belief "with reasonable medical certainty" that Whittaker was "completely disabled" as a result of "multiple medical issues," which he described. (*Id.* at LTD HLI 351-52.) He also wrote that he had never seen the letter from Hartford asking for his opinion on Dr. Kimhelheim's restrictions and did not agree with the response of the physician's assistant who had responded to that letter agreeing with the limitations. (*Id.* at LTD HLI 351.)

### E. Hartford's Reinvestigation of the Termination of Whittaker's Benefits

In response to Dr. Burrows's letter—and before Whittaker had filed an appeal—Hartford notified Whittaker's treating physicians on September 17, 2008 that it was investigating Whittaker's benefits claim and had asked an independent physician to review Whittaker's case. (*Id.* at LTD HLI 340-45.) Dr. David H. Trotter, an orthopaedic surgeon, provided a review of Whittaker's case to Hartford on October 6, 2008. (*Id.* at LTD HLI 338-39.) Dr. Trotter determined that Whittaker "would be able to work full time," as long as the following restrictions were in place: Whittaker could not stand or walk for more than two hours a day, lift more than ten pounds frequently or fifteen pounds occasionally, push or pull more than fifteen pounds, kneel, crawl, crouch, stoop, or bend. (*Id.* at LTD HLI 339.) Dr. Trotter's determination was based on a review of Whittaker's medical records, her statements, and a conversation with Dr. Purcell, who "deferred comment to the other providers," but noted that Whittaker "appears to at least be able to perform a full time sedentary job." (*Id.* at LTD HLI 338.) Dr. Trotter called Dr. Kimelheim and Dr. Burrows but was unable to speak with either. Hartford thus sent both doctors a summary of Dr. Trotter's assessment and asked for their input on

October 7, 2008; Dr. Kimelheim accepted Dr. Trotter's recommendations and said he would review them with Whittaker, but Dr. Burrows wrote that he did not agree with Dr. Trotter's assessment, citing his letter of August 28, 2008. (*Id.* at LTD HLI 14-15, 321, 330.)

After Dr. Trotter's review, on October 14, 2008, Hartford informed Whittaker that it was upholding its termination of her benefits because it concluded she could perform her occupation with the restrictions outlined by Dr. Trotter. (*Id.* at LTD HLI 317-18.) Hartford noted that it had reviewed Dr. Burrows's new letter in reevaluating her claim, but wrote that his letter did not address any "current testing, exam findings, or ongoing symptoms." (*Id.* at LTD HLI 317.)

### F.    Whittaker's Appeal

On April 20, 2009, Whittaker appealed Hartford's termination of her LTD benefits. (*Id.* at LTD HLI 308-09.) Whittaker also submitted a Residual Functional Capacity form filled out by Dr. Burrows. (*Id.* at LTD HLI 286-89.) Dr. Burrows indicated on this form that Whittaker could work up to three hours per day. Specifically, she could spend up to two hours at a time working seated, and up to one hour standing or walking for no more than thirty minutes at a time. (*Id.* at LTD HLI 287.) Dr. Burrows further noted that Whittaker "need[ed] the freedom to rest, recline, or lie down at [her] own discretion throughout the normal work day" and would need to "elevate [her] legs above [her] heart several times a day." (*Id.* at LTD HLI 288.) She could lift ten pounds occasionally and five pounds frequently and could use her hands for the repetitive actions of simple grasping, pushing/pulling, and fine manipulation, but could not use her feet for repetitive movements. (*Id.*) Finally, Dr. Burrows stated that Whittaker took Vicodin and Neurontin, which could cause her fatigue "interfer[ing] with the ability to work," and that her condition could "reasonably be expected"

to cause pain or fatigue that would "preclude full-time, competitive work activity on a sustained basis." (*Id.* at LTD HLI 289.)

After receiving Dr. Burrows's submission, Hartford forwarded Whittaker's entire file, including Dr. Burrows's most recent form, to two physicians for independent medical reviews: Dr. E. Franklin Livingstone, a physiatrist, for a physical review, and Dr. Irwin M. Greenberg, a psychiatrist, for a psychiatric review. As part of his review, Dr. Livingstone spoke with Dr. Purcell, who reported that she had not seen Whittaker for over a year, but that at her last visit Whittaker was "able to sit, stand, and walk in her office" and that she did not know of any "adverse side effects from medications" Whittaker was taking. (*Id.* at LTD HLI 226-27.) Dr. Purcell noted "some psychiatric issues in the past," but said she did not think Whittaker was malingering. (*Id.* at LTD HLI 227.) Dr. Purcell "deferred restrictions and limitations to the rheumatologist," but told Dr. Livingstone that she thought Whittaker was "capable of sedentary level work activities." (*Id.*)

Dr. Livingstone also spoke to Dr. Burrows, who had last seen Whittaker the week before. (*Id.* at LTD HLI 229.) Dr. Burrows reported that Whittaker was "able to sit, stand, and walk in his office." (*Id.*) He said Whittaker had a "history of depression, but that there were no acute psychiatric problems" and she was not experiencing "adverse side effects from medications." (*Id.*) He further stated that Whittaker "might be able to do sedentary work at a desk if she could get up and move about a lot" but also said he believed Whittaker was disabled. (*Id.*)

Dr. Livingstone also spoke with Dr. Kimelheim about Whittaker. Dr. Kimelheim agreed that Whittaker could "sit, stand, and walk in his office," that she had not "complained of any functionally impairing adverse side effects to medications," and that he knew of no cognitive problems and did

not believe she was malingering. (*Id.* at LTD HLI 230-31.) Dr. Kimelheim thought Whittaker "could do sedentary level work," defined as "mostly sitting with occasional brief periods of walking and standing, with ability to change positions as needed to prevent stiffness and development of pain, and lifting, carrying, pushing, and pulling up to 10 pound[s] occasionally." (*Id.* at LTD HLI 231.) Dr. Livingstone's review also referenced a PCE by Dr. Shaffer from April 2008 that identified no restrictions for Whittaker. (*Id.*) Dr. Livingstone ultimately concluded,

> Within the definition of sedentary work, these restrictions and limitations as outlined by Dr. Trotter seem perfectly appropriate given [Whittaker's] many medical issues. . . . There is nothing within the medical records of an objective nature which would preclude this in any way. She is able to work full-time eight hours per day, 40 hours per week, in sedentary-level work intensity activities with the restrictions and limitations as outlined by Dr. Trotter.

(*Id.* at LTD HLI 231-32.)

Dr. Greenberg completed a psychiatric medical review of Whittaker's case. Dr. Greenberg spoke with Dr. Burrows, who identified no cognitive or psychiatric problems or "depressive symptoms or signs," though he noted Whittaker's history of depression. (*Id.* at LTD HLI 241-42.) Dr. Kimelheim similarly reported normal cognition and no findings of psychiatric problems. (*Id.* at LTD HLI 242.) Dr. Purcell also called Whittaker "very intact cognitively" and "intact psychiatrically," with "no observable depression." (*Id.*) Based on Whittaker's records and Dr. Greenberg's conversations with these three doctors, he determined that there existed no objective findings of impairment due to a psychiatric disorder and no psychiatric restrictions or limitations on Whittaker's ability to work full time. (*Id.* at LTD HLI 245.)

On June 2, 2009, Hartford informed Whittaker that its Appeals Unit was upholding the decision to terminate her benefits after its investigation because Whittaker was "functionally capable

of performing her own sedentary occupation." (*Id.* at LTD HLI 249, 256.) On October 14, 2011, Whittaker sued Hartford for ERISA violations arising out of the termination of her LTD benefits.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 32 F.3d 768, 777 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). A court must apply the same standards to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987); *see also St. Paul Fire & Marine Ins. Co. v. Primavera Software, Inc.*, Civ. A. No. 09-3908, 2011 WL 3438077, at *3 (E.D. Pa. Aug. 5, 2011).

## III.   DISCUSSION

Hartford argues that it is entitled to summary judgment on two grounds: first, that its decision as administrator of the Plan to terminate Whittaker's LTD benefits was not arbitrary and capricious because it was supported by substantial evidence, and second, that Whittaker's claim is barred by the statute of limitations as set forth in the Policy. Although the Court finds that Whittaker's claim is not time-barred, summary judgment in favor of Hartford is nevertheless appropriate because Hartford's decision to terminate Whittaker's benefits was not arbitrary or capricious.

### A.   Statute of Limitations

Since ERISA provides no specific statute of limitations period applicable to this case, Pennsylvania's four-year statute of limitations for breach of contract governs. *See Koert v. GE Grp. Life Assurance Co.*, 231 F. App'x 117, 119-20 (3d Cir. 2007). However, a policy can shorten the period in which a claimant can sue, as long as the limitations period is not "manifestly unreasonable." *Id.* at 120. Here, Hartford's policy provided for a three-year limitations period, a period the Third Circuit has found to be reasonable. (J.A. at LTD HLI 191); *Koert*, 231 F. App'x at 120. Thus, the parties agree that the policy's three-year period applies to Whittaker's claim.

To determine when a cause of action accrues on a non-fiduciary ERISA claim, the Third Circuit has adopted the "clear repudiation" rule. This approach is based on the federal discovery rule, under which a cause of action accrues when the plaintiff discovers or should have discovered the injury. *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520-21 (3d Cir. 2007). Therefore, under the clear repudiation rule, the "cause of action accrues when a claim for benefits has been denied[, but] a *formal* denial is not required if there has already been a repudiation of the benefits by the fiduciary

12

which was *clear* and made known [to] the beneficiary." *Id.* In Whittaker's case, Hartford issued its first notice of the termination of her benefits on August 7, 2008, which Hartford contends was a clear repudiation. However, on September 17, 2008, Hartford notified Whittaker's doctors that it was continuing to review its decision. Hartford then confirmed its termination of Whittaker's benefits by letter to Whittaker on October 14, 2008. Whittaker appealed the termination, and Hartford upheld its decision on June 2, 2009. Therefore, whether Whittaker's claim is timely depends on which of these notifications constituted a clear repudiation of Whittaker's benefits; if the clear repudiation occurred prior to October 14, 2008—three years before Whittaker filed her Complaint—then Whittaker's claim is time-barred.

The Court must determine whether Whittaker's cause of action could have accrued before she exhausted her administrative appeals to Hartford. An ERISA plaintiff must generally exhaust her internal administrative remedies before suing in federal court. *See Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002). "The Third Circuit has not directly held whether a claim for benefits can be considered to have been 'clearly repudiated' before an individual has completed the requisite exhaustion of administrative remedies." *Rumpf v. Metro. Life Ins. Co.*, Civ. A. No. 09-557, 2010 WL 2902543, at *7 (E.D. Pa. July 23, 2010) (citation omitted).

The court in *Rumpf* held that the plaintiff's cause of action did not accrue until she had exhausted her administrative appeals. The court reasoned that "it would be unfair and inequitable to hold Plaintiff to any disadvantage because she followed the instructions in the letter she received . . . denying her benefits," which stated that the plaintiff could appeal the insurance company's determination, and that, if her appeal was denied, she could sue in federal court. *Id.* at *8. Therefore,

the court declared that "it would be a miscarriage of justice to find that the accrual date started any earlier than" the date on which the plaintiff's appeal was denied. *Id.*

As in *Rumpf*, both letters in which Hartford notified Whittaker of the termination of her benefits stated, "After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA." (J.A. at LTD HLI 318, 355.) Following the logic of *Rumpf*, this Court also adopts the date of the denial of Whittaker's appeal as the time that her cause of action accrued. Although Whittaker's benefits were first terminated on August 7, 2008, her case would have been dismissed for failure to exhaust her administrative remedies had she filed this lawsuit before her administrative appeal was denied on June 2, 2009. To start the running of the limitations period before the conclusion of the administrative appeals process would encourage plan administrators to drag their feet in deciding administrative appeals so as to minimize the amount of time a plaintiff has to prepare her case.

Hartford cites *Grasselino v. First Unum Life Insurance Co.* to argue that a cause of action accrues before administrative appeals are taken. Civ. A. No. 08-635, 2008 WL 5416403 (D.N.J. Dec. 22, 2008). Grasselino's suit arose out of a twenty-four month limitation on the LTD benefits to which he was entitled for mental illness. The court there deemed the administrator's first letter denying benefits a clear repudiation, and thus a possible date of accrual, because this letter notified the claimant that the benefits were subject to a time limit. *Id.* at *4; *see also Klimowicz v. Unum Life Ins. Co. of Am.*, 296 F. App'x 248, 251 (3d Cir. 2008) (reaching the same conclusion on a similar set of facts). The claimant took administrative appeals when the administrator initially denied his claim for benefits, and the court did not consider these appeals in determining the date of accrual,

*see Grasselino*, 2008 WL 5416403 at *2; however, the outcome of those appeals did not affect Grasselino's later lawsuit for benefits beyond the twenty-four month period.[1] The case is thus distinguishable from Whittaker's, in which the viability of her claim before this Court seeking to reverse the termination of her benefits hinged on the resolution of her administrative appeals to Hartford concerning the same question.

The Court finds that Whittaker's cause of action accrued on June 2, 2009. She filed her Complaint within the three-year statute of limitations period, and her claim is not time-barred.

### B.    Termination of LTD Benefits

Whittaker contends that Hartford violated her rights under ERISA when it terminated her LTD benefits on August 7, 2008, because Whittaker was still disabled at that time. In order for Whittaker to have been disabled under the Plan on that date and entitled to benefits, she had to be unable to perform one of the essential duties of her occupation. If she was able to perform all of the essential duties of her occupation at that time, then she was not disabled under the Plan and was not entitled to receive LTD benefits.

"When the administrator has discretionary authority to determine eligibility for benefits, . . . the decision must be reviewed under an arbitrary and capricious standard." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009). Here, the Plan gives Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms

---

[1] Grasselino pursued a later appeal of the twenty-four month time limit. *Grasselino*, 2008 WL 5416403, at *2. However, the appeal was permitted "pursuant to a Regulatory Settlement Agreement" with state legislators over a year after Grasselino's benefits were set to expire, rather than through the standard administrative appeals process in ERISA cases. *Id.*

and provisions" of the policy. (J.A. at LTD HLI 212.) Thus, the parties agree that the Court must review Hartford's decision to terminate Whittaker's benefits under the arbitrary and capricious standard.

"An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (quoting *Abnathya v. Hoffmann-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). "A decision is supported by 'substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision.'" *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000) (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)). "The scope of this review is narrow, and 'the court is not free to substitute its own judgment for that of the defendant[] in determining eligibility for plan benefits.'" *Doroshow*, 574 F.3d at 234 (quoting *Abnathya*, 2 F.3d at 45). The court must evaluate the administrator's decision based on the "evidence before the Administrator at the time of [the] *final denial*." *Molta v. Hewlett-Packard Emp. Benefits Org.*, Civ. A. No. 04-1705, 2006 WL 777005, at *7 (D.N.J. Mar. 24, 2006) (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 441-42 (3d Cir. 1997) (alteration in original)). Where a conflict of interest exists because the administrator both determines eligibility under and funds a plan, "courts reviewing the decisions of ERISA plan administrators . . . should . . . consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009).

Whittaker sets forth three arguments to demonstrate that Hartford's decision to terminate her benefits was not supported by substantial evidence: (1) Hartford failed to obey its own policy, which

required agreement from all doctors; (2) Hartford did not consider the approval of Whittaker's Social Security claim; and (3) Hartford improperly rejected the opinion of Whittaker's treating physician, Dr. Burrows. Whittaker's arguments fail to persuade the Court that no reasonable person could agree with Hartford's determination, and so it upholds the termination of Whittaker's benefits.

### 1. *Concurrence of treating doctors*

Whittaker first argues that Hartford's decision was arbitrary and capricious because Hartford failed to adhere to its own policy in terminating her benefits without the concurrence of all of her treating doctors. This assertion is based on letters Hartford sent to Dr. Burrows and Dr. Purcell, which stated, "Dr. Kimelheim, Ms. Whittaker's rheumatologist, has provided restrictions and limitations. It is necessary for us to obtain concurrence of all her treating physicians. Do you agree with the restrictions and limitations provided by Dr. Kimelheim?" (J.A. at LTD HLI 24, 25.) Whittaker argues that these letters established a policy of requiring the concurrence of all treating physicians before making a benefits determination. Whittaker further contends that Hartford violated this policy because it did not obtain Dr. Burrows's concurrence with Dr. Kimelheim's opinion, since Dr. Burrows continued to label Whittaker completely disabled.

Whittaker is correct that "an ERISA plan administrator must 'discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan . . . .'" *Steele v. Boeing Co.*, 399 F. Supp. 2d 628, 635 (E.D. Pa. 2005) (quoting 29 U.S.C. § 1104(a)(1)(D)), *vacated on other grounds by* 225 F. App'x 71 (3d Cir. 2007). Yet a letter from the Plan administrator to a treating physician is not such a document or instrument. Rather, Hartford distributes to Plan participants a lengthy policy setting forth the terms of the Plan; this document states that "[t]he terms

of the Group Insurance Policy which affect an employee's insurance are contained in the following pages." (J.A. at LTD HLI 132.) This policy contains no concurrence requirement, and Whittaker does not contend otherwise. A Plan participant seeking information about her benefits would no doubt turn to this document as the authoritative source regarding her rights and obligations under the Plan, and not to correspondence in which Hartford solicits a medical opinion from physicians. Indeed, although the outer bounds of what constitutes "documents and instruments governing the plan" under § 1104(a)(1)(D) are largely unexplored by case law,[2] the court in *Steele* referenced only the policy as a governing instrument and included no extraneous documents. Therefore, the letters from Hartford to Whittaker's physicians did not create any binding policy.

2. *Role of Social Security approval*

Whittaker next objects to Hartford's decision as arbitrary and capricious because Hartford failed to consider adequately Whittaker's approval for disability benefits by the Social Security Administration ("SSA") in terminating her benefits. Whittaker's argument fails for two reasons.

First, the Third Circuit has made clear that Social Security approval is not binding on a plan

---

[2] To the extent that the "documents and instruments governing the plan" under § 1104(a)(1)(D) are coterminous with the "terms of the plan" under which a participant can sue to recover benefits under 29 U.S.C. § 1132(a)(1)(B), Hartford is correct that case law would not dictate including Hartford's letters to Whittaker's doctors. The Supreme Court has determined that the "terms of the plan" under § 1132(a)(1)(B) do not include communications summarizing plan terms from the administrator to participants. *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1877-78 (2011); *see also Haviland v. Metro. Life Ins. Co.*, Civ. A. No. 11-13176, 2012 WL 2403484, at *12 n.2 (E.D. Mich. June 26, 2012) (finding letters that "communicated information to Plan beneficiaries regarding their benefits" were not "terms of the plan" under § 1132(a)(1)(B)). Since letters about plan benefits from the administrator to a plan participant do not qualify as plan documents based on Supreme Court precedent, letters from the administrator addressed to doctors—and not to plan participants—cannot be said to become terms of the plan enforceable by a participant.

administrator. *See, e.g.*, *Brandeburg v. Corning Inc. Pension Plan for Hourly Emps.*, 243 F. App'x 671, 674 n.3 (3d Cir. 2007) ("While an SSA award may be considered as a factor in determining whether an ERISA administrator's decision to deny benefits was arbitrary and capricious, it 'does not in itself indicate that an administrator's decision was arbitrary and capricious, and [] a plan administrator is not bound by the SSA decision.'" (quoting *Dorsey v. Provident Life & Accident Ins. Co.*, 167 F. Supp. 2d 846, 856 n.11 (E.D. Pa. 2001)) (alteration in original)).

Second, the SSA's determination did not occur at a time relevant to Hartford's termination of Whittaker's benefits. While the SSA found Whittaker eligible for disability benefits as of November 2006, Hartford also found that Whittaker was disabled under the Plan at that time and had already been paying her LTD benefits. Rather, it was not until August 2008—over twenty months after her Social Security approval—that Hartford terminated payment of Whittaker's benefits based on its finding that she was no longer disabled. Moreover, one is "disabled" under the Social Security Act if she cannot work because of a medical impairment "which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). As such, the SSA's approval of Whittaker's disability benefits required only a determination that her disability be expected to last for one year. Hartford agreed that Whittaker was disabled during this year-long period and continued to pay her LTD benefits for more than a year after the SSA deemed Whittaker disabled and approved her claim. Thus, Whittaker's Social Security approval was, in fact, consistent with Hartford's provision of benefits to Whittaker in November 2006 and for more than one year afterward, and has little bearing on the validity of Hartford's determination that Whittaker was no longer disabled many months later.

### 3. Dr. Burrows's opinion

Finally, Whittaker argues that Hartford's decision to terminate her benefits was arbitrary and capricious because Hartford failed to credit Dr. Burrows's opinion and because Whittaker's condition actually deteriorated, rather than improved. Whittaker argues specifically that Dr. Burrows was best situated to assess Whittaker's ability to work because he treated her with greater frequency than other doctors who offered opinions. Yet "the mere fact that an administrator relies on medical evidence that conflicts with the treating physician's opinion does not render the denial of benefits arbitrary." *Ford v. UNUM Life Ins. Co. of Am.*, 351 F. App'x 703, 707 (3d Cir. 2009).

An occupational analysis procured by Hartford determined that Whittaker's occupation was sedentary and required the ability to lift, carry, push, and pull ten pounds occasionally, but involved mostly sitting, potentially with brief periods of standing or walking. Dr. Kimelheim indicated in a PCE in April 2008 that Whittaker could sit in a general workplace environment for a total of four hours per day, for a maximum of one hour at a time, and could stand and walk for two hours each per day, for no more than fifteen minutes at a time. He further wrote that she could lift, carry, push or pull up to twenty pounds frequently. These restrictions would not interfere with the requirements of Whittaker's sedentary occupation as identified in her occupational analysis, and Dr. Kimelheim later said that he believed Whittaker to be capable of sedentary level work. During Hartford's reinvestigation of the benefits termination in October 2008, Dr. Trotter similarly found that Whittaker could work full time, as long as she did not stand or walk for more than two hours per day, lift more than fifteen pounds occasionally or ten pounds frequently, or push or pull more than fifteen pounds. Again, the restrictions set forth by Dr. Trotter are consistent with Whittaker's ability to

perform the essential duties of her occupation, according to the occupational analysis.

In deciding that Whittaker could perform the essential duties of her occupation and was no longer disabled, Hartford further relied on the medical opinions of Dr. Shaffer, who said Whittaker had no limitations; Dr. Purcell, who agreed with and deferred to Dr. Kimelheim as to Whittaker's restrictions and limitations, but said she thought Whittaker was capable of sedentary work; Dr. Livingstone, who agreed with Dr. Trotter and said Whittaker could do full-time sedentary work with Dr. Trotter's restrictions; and Dr. Greenberg, who found no psychiatric limitations on Whittaker's ability to work full time. While these doctors acknowledged Whittaker's continuing pain and medical issues, their findings contravene Whittaker's assertion that her condition was deteriorating rather than improving.

Only Dr. Burrows disagreed with the conclusion that Whittaker was capable of sedentary work with certain restrictions, instead calling Whittaker disabled in April of 2008 and finding her capable of driving occasionally but incapable of spending any time sitting, standing, or walking in a workplace, lifting, carrying, pushing, pulling, reaching, handling, or feeling, among other things. Yet even Dr. Burrows came to believe by May 2009 that Whittaker might be able to do sedentary work if she could get up and move frequently. It is clear that Hartford took Dr. Burrows's opinion into consideration, since it independently undertook a review of its initial termination of Whittaker's benefits in response to Dr. Burrows's letter of August 2008, in which he objected to the benefits termination. In fact, Hartford explicitly stated in upholding the termination that it had reviewed Dr. Burrows's letter, but that the letter did not contain current testing, exam findings, or ongoing symptoms.

In terminating Whittaker's benefits, Hartford relied on the opinions of three doctors who treated Whittaker and three independent doctors who spoke with her treating physicians and reviewed her files. All of these doctors found Whittaker capable of sedentary work. Dr. Burrows alone disagreed. Certainly, there was enough evidence here for a reasonable person to agree with Hartford's determination. Though the Court does not ignore the conflict of interest presented by Hartford's dual role in funding and determining eligibility under the Plan, this is but one factor for the Court to weigh. In the face of widespread agreement by Whittaker's treating physicians and independent physicians that Whittaker was capable of sedentary work, Hartford's conflict of interest coupled with the opinion of one outlier physician fails to persuade the Court that Hartford's determination was arbitrary or capricious.

## IV.    CONCLUSION

In light of the foregoing, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied. An Order consisted with this Memorandum will be docketed separately.